**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEITH A. WILLIAMS,** | : | **CIVIL ACTION NO. 1:07-CV-1382** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH SMITH**, et al., | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Keith A. Williams ("Williams"), a federal inmate formerly

incarcerated at the United States Penitentiary at Lewisburg ("USP Lewisburg"),

Lewisburg, Pennsylvania, commenced this federal civil rights action on July 30,

2007. (Doc. 1.) Presently pending is a motion for summary judgment, filed on

behalf of the following Federal Bureau of Prison ("BOP") employees: former USP

Lewisburg Warden Joseph Smith ("Smith"); Lieutenant Edinger ("Edinger");

Lieutenant Gabrielson ("Gabrielson"); and Corrections Officer Murray ("Murray").[1]

(Doc. 79.) For the reasons set forth below, the motion for summary judgment will

be granted in part and denied in part.

## I.    Statement of Facts

In his complaint, Williams alleged that "[p]rior to July 18, 2005[,]" he was

involved in "several violent encounters with various members of the

---

[1]Lieutenant Edinger is incorrectly identified by Williams as "Eddinger," Lieutenant Gabrielson is incorrectly identified  as Gaberson and Murray is wrongly identified as "Murry."  (Doc. 1).

Washington D.C. (D.C.) and New York (N.Y.) gangs; involving several fights." (Doc. 84 ¶ 1; Doc. 91, ¶ 1.) Williams further alleged that he was placed in the Special Housing Unit ("SHU") at the United States Penitentiary in Lewisburg, Pennsylvania ("USP Lewisburg") "after being assaulted by various members of both the D.C. and N.Y. gangs." (Doc. 84 ¶ 2; Doc. 91, ¶ 2.) As relief, Williams seeks compensatory, punitive, "cosmetic," and treble damages for the alleged constitutional violations. (Doc. 84 ¶ 3; Doc. 91, ¶ 3.)

On July 18, 2005, at 5:35 p.m., Senior Officer Treibley ("Treibley") was informed that there was a fight at 5:30 p.m. on the C block, second floor. (Doc. 84, ¶ 4, Exhibit ("Ex.") 2; Doc. 91, ¶ 4.) Treibley notified Lieutenant Sawyer ("Sawyer") Senior Officer Kissell ("Kissell") of a possible fight and searched the unit for blood. (Doc. 84 ¶ 5; Doc. 91, ¶ 5.) At approximately 5:45 p.m., Kissell reviewed video surveillance for a possible altercation on the C-block, second floor range. (Doc. 84, ¶ 6, Ex. 3; Doc. 91, ¶ 6.) He called Treibley and advised him that the incident was on tape. (Doc. 84, ¶ 7, Ex. 2; Doc. 91, ¶ 7.) Treibley secured all the inmates in their cells and locked down the unit so that the inmates involved in the altercation could be identified. (Doc. 84, ¶¶ 8-9, Exs. 2, 4; Doc. 91, ¶¶ 8-9.) On the video at 5:25:21 p.m., Kissell saw two inmates, who were later identified as Andrew Long and Williams, having a conversation by the C-Block second floor stairwell. (Doc. 84, ¶ 10, Ex. 3; Doc. 91, ¶ 10.) At 5:25:22 p.m., Kissell saw these two inmates physically assaulting each other with closed fists. (Doc. 84, ¶ 11, Ex. 3; Doc. 91, ¶ 11.) Once identified, the inmates were escorted to the Lieutenant's office and they claimed that they were

2

wrestling and it was a misunderstanding. (Doc. 84, ¶ 12, Ex. 4; Doc. 91, ¶ 12.) Williams, testified that Long was the first one to show aggression and that he did not assault Long; he merely defended himself. (Doc. 91, ¶ 11, Ex. 1.) He did not recall reporting to the Lieutenant that he and Long were wrestling. (Id.)

Both inmates were then escorted to health services for medical treatment. (Doc. 84, ¶ 13, Ex. 4; Doc. 91, ¶ 13.) Williams received treatment for a cut above his left eye. (Doc. 84, ¶ 14, Ex. 4; Doc. 91, ¶ 14.) Both inmates were then taken to the SHU with no further incidents. (Doc. 84, ¶ 15, Ex. 4; Doc. 91, ¶ 15.) Williams received a disciplinary incident report for fighting. (Doc. 84, ¶ 16, Ex. 3; Doc. 91, ¶ 16.) The Unit Discipline Committee referred this matter to the Disciplinary Hearing Officer ("DHO"). (Doc. 84, ¶ 17, Ex. 3; Doc. 91, ¶ 17.) At the DHO hearing, Williams testified and admitted his involvement in the fight and was found guilty of fighting and sanctioned. (Doc. 84, ¶¶ 18-19, Ex. 5; Doc. 91, ¶¶ 18-19.) Although he admitted that he hit Long first in the face, he maintains that Long was the aggressor and that he was merely defending himself. (Doc. 84, ¶ 20, Ex. 4; Doc. 91, ¶¶ 11, 20, Ex. 1.)

At his deposition, Williams admitted that this was his first fight with Long and "[i]t was unexpected. [Long's] attitude and his action was very unexpected to [Williams] because [Williams] wasn't aware of any aggression upon [Williams] . . . . [i]t was never at a time as we were cellies that there was disrespect or argument or anything of that degree." (Doc. 84, ¶ 21, Ex. 6; Doc. 91, ¶ 21.) Williams initially testified that he was not sure if there was a BOP officer that witnessed the fight, but

then clarified his position stating that only inmates were around when he fought with Long and no BOP officers were around to witness the fight. (Doc. 84, ¶ 22; Doc. 91, ¶ 22, Ex. 1.)

Williams was "not sure" whether Long was a member of any gang, but was aware that he was from D.C. (Doc. 84, ¶ 26, Exs. 6, 7; Doc. 91, ¶ 26, Ex. 1.) When Williams was asked if any of the defendants would have known that he was going to fight with Long, he testified "if you was observing, you wouldn't have never had a clue that such a thing would happen . . . it was a surprise to me." (Doc. 84, ¶ 28, Ex. 6; Doc. 91, ¶ 28.) When Williams was asked how the defendants would know he was going to fight with Long, he replied "I never said that they would know." (Doc. 84, ¶ 29, Ex. 6; Doc. 91, ¶ 29.) Williams conceded that he was not afraid of Long after they fought. (Doc. 84, ¶ 30, Ex. 6; Doc. 91, ¶ 30.) When he was asked about what occurred when he was assaulted in the outside recreation cage, he testified "[i]t could have been no more than five minutes as the officer is leaving. Just aware that he can get a distance away from the cage, the incident out of sight, it happened. They walk upon me; and the assault began, you know." (Doc. 84, ¶ 31, Ex. 6; Doc. 91, ¶ 31.)

Following this incident, Williams was housed in the SHU. (Doc. 84, ¶ 23, Exs. 6, 7; Doc. 91, ¶ 23.) Williams was separated from the inmate he fought with on July 18, 2005, meaning they would never be celled together or put in a recreation cage

together.  (Doc. 84, ¶ 24, Exs. 7-8 ; Doc. 91, ¶ 24.)  Williams conceded he was

separated from Long, testifying that he neither saw Long again nor spoke to Long.

(Doc. 84, ¶ 25, Ex. 6; Doc. 91, ¶ 25.)

On July 28, 2005 at 7:28 a.m., Senior Officer Specialist Keiser ("Keiser"), SHU

recreation officer, witnessed two inmates assaulting Williams in an outside SHU

recreation pen.  (Doc. 84, ¶ 32, Exs. 9, 10; Doc. 91, ¶ 32.)  Keiser immediately called

for SHU staff to report to the SHU recreation pens.  (Doc. 84, ¶ 33, Ex. 9; Doc. 91, ¶

33.)  Senior Officer Wagner ("Wagner") was placing inmates in another recreation

pen and heard noises coming from the recreation pen where Williams was located.

(Doc. 84, ¶ 34, Ex. 11; Doc. 91, ¶ 34.)  Wagner saw two inmates hitting Williams in the

face with closed fists and ordered the inmates in the recreation pen to stop fighting

and lay on the ground.  (Doc. 84, ¶ 35, Ex. 11; Doc. 91, ¶ 35.)  The inmates complied

with Wagner's orders.  (Doc. 84, ¶ 36, Ex. 11; Doc. 91, ¶ 36.)  Senior Officer Specialist

Dressler ("Dressler") responded to Keiser's request for assistance and saw Williams

bent over bleeding.  (Doc. 84, ¶ 37, Ex. 12; Doc. 91, ¶ 37.)  Dressler ordered the

inmates in the recreation pen to lay down.  (Doc. 84, ¶ 38, Ex. 12; Doc. 91, ¶ 38.)

Senior Officer Clark ("Clark") also responded to Keiser's request for assistance and

ordered the inmates in the recreation pen to lay on the ground.  (Doc. 84, ¶ 39, Ex.

13; Doc. 91, ¶ 39.)  Williams confirmed that the fight stopped because officers "ran"

towards the cage and ordered them to "get down." (Doc. 84, ¶ 40, Ex. 6; Doc. 91, ¶

40.)  Williams conceded he does not know the officer's name who ran to the cage.

(Doc. 84, ¶ 41, Ex. 6; Doc. 91, ¶ 41.)  When Senior Officer Toth ("Toth") responded to

5

Keiser's request for assistance, all the inmates in the recreation pen were laying down, except Williams. (Doc. 84, ¶ 42, Ex. 14; Doc. 91, ¶ 42.) When SHU Lieutenant Gabrielson ("Gabrielson") arrived at the outside SHU recreation pens, all the inmates were laying face down with their arms extended and palms facing up. (Doc. 84, ¶ 43, Exs. 7, 10; Doc. 91, ¶ 43.) Gabrielson was informed that Williams was assaulted by two inmates and instructed staff to remove Williams from the recreation cage and escort him to health services. (Doc. 84, ¶ 44, Ex. 10; Doc. 91, ¶ 44.) The other inmates were examined for injuries and returned to their cells without incident. (Doc. 84, ¶ 45, Ex. 10; Doc. 91, ¶ 45.) Restraints were applied to Williams and he was removed from the recreation pen. (Doc. 84, ¶ 46, Ex. 13; Doc. 91, ¶ 46.) Clark escorted Williams to the urgent care room in the hospital area for medical assistance. (Doc. 84, ¶ 47, Ex. 13; Doc. 91, ¶ 47.) Once Williams was treated, Clark escorted Williams back to the SHU without incident. (Doc. 84, ¶ 48, Ex. 13; Doc. 91, ¶ 48.) In investigating this incident, inmates Joyner and Reeder admitted to assaulting Williams. (Doc. 84, ¶ 49, Ex. 10; Doc. 91, ¶ 49.) Joyner and Reeder claimed that Williams was assaulted because he was "continually calling other inmates" and them names, such as "bitch cowards," and because of a disrespect issue between them and Williams, rather than "a territorial thing between DC/NY and Bloods." (Doc. 84, ¶¶ 50- 51, Ex. 10.) Williams testified that they assaulted him because they were N.Y. and D.C. gang members. (Doc. 91, ¶ 49, Ex. 1.) As a result

of this incident, Williams was permanently separated from Joyner and Reeder. (Doc. 84, ¶ 52, Ex. 8, 15; Doc. 91, ¶ 52.)[2]

Williams testified that he believes one of the guys who assaulted him is from D.C. and the other guy is from New York.  (Doc. 84, ¶ 56, Ex. 6; Doc. 91, ¶ 56.)  When Williams was asked how he knows where the two individuals who assaulted him are from, he testified he learned this information from listening to inmates speak: "[i]f you've been in that area in prison on that range people talking, you know what I'm saying. That's how you hear that."  (Doc. 84, ¶ 57, Ex. 6; Doc. 91, ¶ 57.)  Williams does not know the names of the inmates who assaulted him in the recreation pen; The first time he ever saw them was in the recreation pen.  (Doc. 84, ¶ 58, Ex. 8; Doc. 91, ¶ 58.)  When asked whether he feared these two inmates, he responded "I didn't even know these - - no. I wasn't even aware at the time that these two people right here was gonna assault me, you know."  (Doc. 84, ¶ 59, Ex. 6.)  Although the July 28, 2005 incident in the recreation pen "was unexpected to [Williams]," prior to this incident, he indicated that he  wrote a cop-out to an unnamed Lieutenant stating he "wanted a cell by [him]self; and [he] fel[t] that [his] life [was] in danger." (Doc. 84, ¶¶ 60, 63, Ex. 6; Doc. 91, ¶ 63.)  However, he does not have a copy of this cop-out.  (Doc. 84, ¶ 64, Ex. 6; Doc. 91, ¶ 64.)  He did not say anything about not going into the cage because "[He] wasn't even aware of the guys" in the cage.  (Doc.

---

[2]Gabrielson testified that he did not put Williams in the recreation cage on July 28, 2005.  (Doc. 84, ¶ 53, Ex. 7; Doc. 91, ¶ 53.)  Williams claims that Edinger put him in the recreation cage that day. (Doc. 91, ¶ 54, Ex 1.)

84, ¶ 59, Ex. 6.)  He explained that he believes he was assaulted in the recreation cage "as they being from that area, from D.C., and as they rise together I was assaulted as further as homeboy stuff. . . .  It was nothing that I had done to them or stated to them."  (Doc. 84, ¶ 62, Ex. 6; Doc. 91, ¶ 62.)

After the incident, Williams testified that he believes he spoke to Gabrielson about fearing for his safety.  (Doc. 84, ¶ 68, Ex. 6; Doc. 91, ¶ 68.)  He did not restate the situation with the D.C. and New York gangs, because he had already done so in the cop-out and "the things [he] stated on the compound are the safety of [his] life." (Doc. 84, ¶ 69, Ex. 6; Doc. 91, ¶ 69.)  Gabrielson does not recall Williams ever addressing "any concerns about being housed or celled with certain inmates" or telling him "he didn't want to be celled with anyone from a D.C. or New York gang."  (Doc. 84, ¶ 70, Ex. 7; Doc. 91, ¶ 70, Ex. 1.)  Nor was he aware of "any reason to keep [Williams] away from D.C. or New York inmates."  (Doc. 84, ¶ 71, Ex. 6; Doc. 91, ¶ 71, Ex. 1.)  Gabrielson further testified that if Williams "would have expressed concerns about being celled with someone" he would remember that." (Doc. 84, ¶ 68, Ex. 6; Doc. 91, ¶ 68.)  Other than writing to his attorney, Williams did not speak with Gabrielson again or anyone else about his fears.  (Doc. 84, ¶ ¶ 73, 74, Ex. 6; Doc. 91, ¶ 73, 74 Ex. 1.)  By letter dated August 16, 2005, Williams's counsel sent a letter to the attention of the Warden of USP Lewisburg advising the Warden he received a letter from his client claiming that he was assaulted on July 27, 2005, by other inmates, and requesting that the matter be thoroughly investigated and reported and that appropriate measures otherwise taken for the safety and well

being of Williams.  (Doc. 84, ¶ 75, Ex. 17; Doc. 91, ¶ 75.)  Smith does not recall receiving correspondence from Williams's attorney requesting to have the July 27, 2005 incident investigated and reported.  (Doc. 84, ¶ 76, Ex. 8; Doc. 91, ¶ 76.)  The Warden's Office receives voluminous amounts of correspondence from inmates' attorneys so it may have been received.  (Doc. 84, ¶ 77, Ex. 8; Doc. 91, ¶ 77.)

Gabrielson testified that despite Williams' fight with Long, it would not be unusual to place Williams in a recreation pen with inmates from New York or D.C.  (Doc. 84, ¶ 65, Ex. 7; Doc. 91, ¶ 65.)  In Gabrielson's correctional experience, just being involved in a fight with an inmate from a certain city would not necessarily mean the inmate would continue to have issues with other inmates from that city.  (Doc. 84, ¶ 66, Ex. 16; Doc. 91, ¶ 66.)  Because of USP Lewisburg's location in the Northeast, inmates from the D.C. and New York areas make up a significant portion of the inmate population.  (Doc. 84, ¶ 67, Ex. 15; Doc. 91, ¶ 67.)

While in USP Lewisburg's SHU, Williams's cell assignment was rotated several times, approximately every 21 days, from July 2005 through November 2005.  (Doc. 84, ¶ 78, Ex. 16; Doc. 91, ¶ 78.)  This is the normal practice within a segregated housing unit for various reasons, such as discouraging the collection of contraband or manipulating security devices within a specific cell.  (Doc. 84, ¶ 79, Ex. 16; Doc. 91, ¶ 79.)  On November 17, 2005, Williams was moved into cell 003 of the SHU.  (Doc. 84, ¶ 80, Ex. 16; Doc. 91, ¶ 80.)  On that same date, Fulton was moved into that cell.  (Doc. 84, ¶ 81, Ex. 16; Doc. 91, ¶ 81.)  Gabrielson was responsible for housing Williams and Fulton together.  (Doc. 84, ¶ 82, Ex. 7; Doc. 91, ¶ 82.)  Fulton was

neither a "separatee" from Williams nor was he involved in either of the July 2005 altercations.  (Doc. 84, ¶ 83, Ex. 16; Doc. 91, ¶ 83.)

On November 27, 2005 at 6:20 a.m., Senior Officer Murray ("Murray") was handing out breakfast trays to inmates on the basement range in the SHU.  (Doc. 84, ¶ 97, Exs. 19, 20; Doc. 91, ¶ 97.)  Murray handed two trays to Williams in his cell and turned to pick up milk from the cart for that cell.  (Doc. 84, ¶ 98, Ex. 20; Doc. 91, ¶ 98.)  As he set the milk down on the food slot door, he observed and heard Williams and Fulton become involved in an altercation.  (Doc. 84, ¶ 99, Ex. 20; Doc. 91, ¶ 99.)  Williams testified that when he went to pick up his breakfast tray from Murray "Fulton ran behind [him] and put [him] in a head-lock position and began to cut [him]."  (Doc. 84, ¶ 100, Ex. 6; Doc. 91, ¶ 100.)  Murray testified that the cell was dark because the lights were covered and the only light was from a window in the cell.  (Doc. 84, ¶ 101, Ex. 21; Doc. 91, ¶ 101.)  Murray believed Williams appeared to be trying to defend himself against his cellmate.  (Doc. 84, ¶ 102, Ex. 20; Doc. 91, ¶ 102.)  Murray immediately gave the inmates a direct order to separate and after the passage of approximately ten or fifteen seconds, they split up and stood in different corners of the cell.  (Doc. 84, ¶ 103, Exs. 20, 21; Doc. 91, ¶ 103, Ex. 2.)  Fulton moved to the back of the cell and put his arms out with his palms facing up.  (Doc. 84, ¶ 104, Exs. 19, 20; Doc. 91, ¶ 104.)  Williams stayed in the front of the cell and was bleeding from facial injuries.  (Doc. 84, ¶ 105, Exs. 19, 20; Doc. 91, ¶ 105.)

Murray immediately radioed Senior Officer Specialist Hornberger ("Hornberger") to come to the basement range in the SHU.  (Doc. 84, ¶ 106, Exs.19,

20; Doc. 91, ¶ 106.) While waiting for additional officers to arrive, both inmates stayed in different corners of the cell and Fulton stated "I told you to stop f_ _ _ _ _ _ with me." (Doc. 84, ¶ 107, Exs. 19, 20; Doc. 91, ¶ 107.) Murray testified that he could not open the cell until other officers arrived. (Doc. 84, ¶ 108, Ex. 21; Doc. 91, ¶ 108.) At approximately 6:20 a.m., Hornberger received a call on the radio from Murray to immediately report to the SHU basement. (Doc. 84, ¶ 109, Ex. 22; Doc. 91, ¶ 109.) At approximately 6:20 a.m., Senior Officer Specialist Dunkle ("Dunkle") immediately responded to a call for assistance from Murray and took restraints to the SHU basement. (Doc. 84, ¶ 110, Ex. 23; Doc. 91, ¶ 110.) When L. Potter heard Murray's call for assistance, he went to the SHU basement and saw Williams and Fulton standing separated in the cell. (Doc. 84, ¶ 111, Ex. 24; Doc. 91, ¶ 111.) At 6:30 a.m., Lieutenant Carrasquillo ("Carrasquillo") received a call from Hornberger to immediately report to the SHU basement because Fulton cut Williams' face. (Doc. 84, ¶ 112, Ex. 25; Doc. 91, ¶ 112.) When Carrasquillo arrived, he observed Williams bleeding around his neck area and ordered them removed from the cell. (Doc. 84, ¶ 113, Exs. 25-26; Doc. 91, ¶ 113.) Because L. Potter was the only one with protective gloves, he ordered Williams and Fulton to come to the door one at a time to be handcuffed. (Doc. 84, ¶ 114, Ex. 24; Doc. 91, ¶ 114.) Williams was handcuffed first and then Fulton. (Doc. 84, ¶ 115, Ex. 24; Doc. 91, ¶ 115.) Lieutenant Heath ("Heath") also received a call to report to the SHU basement at approximately 6:20 a.m. and when he arrived Williams and Fulton were already handcuffed. (Doc. 84, ¶ 116, Ex. 26; Doc. 91, ¶ 116.) Carrasquillo ordered the cell to be opened because both inmates

were restrained and  Hornberger escorted Fulton to a SHU holding cell and strip searched him.  (Doc. 84, ¶¶ 117-118, Exs. 22, 26; Doc. 91, ¶ 117-118.)  L. Potter and Heath escorted Williams to the urgent care room for medical treatment.  (Doc. 84, ¶ 119, Ex. 24; Doc. 91, ¶ 119.)

In the urgent care room, Williams stated he was not getting along with Fulton for a few days and Fulton attacked him with a razor blade as they were receiving their morning meal.  (Doc. 84, ¶ 120, Ex. 26; Doc. 91, ¶ 120.)  Williams explained that Fulton put him in a head lock and cut his face.  (Doc. 84, ¶ 121, Ex. 26; Doc. 91, ¶ 121.)  Thereafter, Williams was transported to a local hospital for further medical treatment.  (Doc. 84, ¶ 122, Ex. 26; Doc. 91, ¶ 122.)

At approximately 10:00 p.m., Fulton removed a straight edged razor blade wrapped in electrical tape from his rectum. (Doc. 84, ¶ 123, Ex. 26; Doc. 91, ¶ 123.) The razor blade and homemade sheath were placed into an evidence bag.  (Doc. 84, ¶ 124, Ex. 26; Doc. 91, ¶ 124.)

On November 27, 2005, Gabrielson was the Acting Captain of USP Lewisburg and was called in from home and arrived after the incident was over.  (Doc. 84, ¶ 125, Ex. 7; Doc. 91, ¶ 125.)  According to Gabrielson, during interviews, it was alleged that this incident was Williams "swearing in to the Bloods."  (Doc. 84, ¶ 128, Ex. 7; Doc. 91, ¶ 128.)  Gabrielson believed this to be true because "the Bloods have a scar, blood in and blood out.  That was [Fulton's] way to bring [Williams] into the gang. It wasn't an assault."  (Doc. 84, ¶ 129, Ex. 7.)

Gabrielson testified that Fulton stated that he "carried [the razor blade] with him everywhere he went in this institution[,]" and BOP staff could not detect it in his rectum unless they X-rayed him. (Doc. 84, ¶ 126, Ex. 7; Doc. 91, ¶ 126.) The razor blade Fulton had would not have been given to him by BOP staff and was not the same razor that is handed out to inmates. (Doc. 84, ¶ 127, Ex. 7; Doc. 91, ¶ 127.) Gabrielson reasoned that "Williams allowed Fulton to re-keister that weapon while they were in the cell together, and there was no struggle;" "No injuries on Fulton whatsoever. . . everything added up to that that was Williams' swearing in to the Bloods." (Doc. 84, ¶¶ 130-31, Ex. 7.) Williams vigorously disputes that he had any knowledge of Fulton's possession of a weapon and completely denies that this was a swearing in to the Bloods. (Doc. 91, ¶¶ 129-31, Ex. 1.)

Murray testified that inmates normally fight in front of an officer because the officer will give an order to stop and the inmates do not have to fight any further. (Doc. 84, ¶ 132, Ex. 21; Doc. 91, ¶ 132.) He further testified that he did not know anything about Williams or recall any direct contact with him prior to the November 27, 2005 incident. (Doc. 84, ¶¶ 133-134, Ex. 21; Doc. 91, ¶¶ 133-134.) Also, Williams stated that "I couldn't say that [Murray knew] I'm going to be attacked or not. I never stated that in my compliant (sic) that I say Mr. Murray have knowledge that by me being placed in a cell with Mr. Fulton that I'm gonna be assaulted." (Doc. 84, ¶ 136, Ex. 6.) Williams testified that while he was being cut by Fulton, Murray told him not to snitch. (Doc. 84, ¶ 137, Ex. 6; Doc. 91, ¶ 137.) Conversely, he testified "as the incident took place you gotta understand that I was

in a trance." (Doc. 84, ¶ 138, Ex. 6; Doc. 91, ¶ 138.) When Williams was asked how

he would hide his facial wounds, he responded "I have no - you know, that

statement that [Senior Officer Murray] made was surprising to me. . . . you can't

hide this. . . .This is plain view. You can't hide this." (Doc. 84, ¶ 139, Ex. 6; Doc. 91,

¶ 139.) Williams confirmed that Murray called for assistance and when he was

asked why Murray would call for assistance if Williams was not to snitch, he replied

"I don't have no idea." (Doc. 84, ¶ 140, Ex. 6; Doc. 91, ¶ 140.)

   Although Gabrielson and Edinger testified that Williams was designated as a

member of the Bloods gang, Gabrielson also identified him as an associate of the

Bloods gang, explaining that he was "not a full member but somebody that hangs

around with them and does their work for them trying to become a member. (Doc.

84, ¶¶ 84, 85, Exs. 7, 18) Conversely, Williams testified that he was attacked by a

member of the Bloods and felt threatened by them. (Doc. 91, ¶ 84.)

   Both Gabrielson and Edinger also testified that Fulton is a member of the

Bloods gang. (Doc. 84, ¶ 86, Ex. 7; Doc. 91, ¶ 86.) Gabrielson testified that Fulton

was the leader of the New York Bloods and he was not concerned about housing

Williams and Fulton together because Williams "really looked up to [Fulton] due to

the fact that [Williams] was an associate of the New York Bloods. And he seemed

like a puppet for [Fulton]." (Doc. 84, ¶¶ 87, 88, Ex. 7.) Williams's testimony

contradicts Gabrielson's testimony in that Williams stated that he did not know

Fulton was from New York until after they were celled together. (Doc. 91, ¶ 88, Ex.

6.) Specifically, the first day they were housed together Williams learned that

14

Fulton was a member of a gang, that he was from New York, and that he was "a Blood or something like that." (Doc. 84, ¶¶ 89, 90, Ex. 6; Doc. 91, ¶¶ 89, 90.)

Although Williams testified that "I wasn't afraid to be in the cell with an individual that I didn't have a problem with. . . . I wasn't afraid to be in a cell with him . . . I'm a man. You a man. So I'm not afraid ," he also testified that he felt his life was threatened if he was housed with a member of the New York gang. (Doc. 84, ¶ 91, Doc. 91, ¶ 91.) While he also felt his "life would be in danger [if housed] in the cell with a guy from New York or D.C.," he admitted because Fulton showed no hostility toward him, he felt "that everything [was] all right." (Doc. 84, ¶ 92, Ex. 6, Doc. 91, ¶ 92.) Even though he had previously indicated that housing him with a member of the New York gang would be a threat to his life, he did not say anything about being housed with Fulton, explaining "I would have if it had been a problem occurred and I felt my life was in danger and hostile. Of course, I would have made a move to try to get out the cell." (Doc. 84, ¶ 93, Ex. 6, Doc. 91, ¶ 93.) In describing his relationship with Fulton, Williams testified "we never had a disturbance or a (sic) argument or a disagreement or any attempt to see to get in an assault or fight or anything of that nature" and "[t]here was no disagreement, no argument, not even type of signs of a threat among each other." (Doc. 84, ¶¶ 94-95, Ex. 6.) Gabrielson confirmed that these two inmates lived together without incident until November 27, 2005. (Doc. 84,¶ 96, Ex. 16.) However, Williams testified that the members of the D.C. and New York gangs were trying to "rock [him] to sleep" so that he would not be ready for an attack. (Doc. 91, ¶ 96, Ex. 1.)

15

The BOP's Office of Internal Affairs ("OIA") conducted an investigation regarding Williams' allegations that Murray did not try to stop Fulton from assaulting him, failed to call for assistance, and was aware of a problem between he and Fulton. (Doc. 84, ¶ 142, Ex. 27; Doc. 91, ¶ 142.) OIA concluded that there was no evidence to support Williams' claims that Murray failed to protect Williams or call for assistance in a timely manner. Doc. 84, ¶ 143, Ex. 27; Doc. 91, ¶ 143.) OIA reported its conclusion and a summary of the statements taken in the investigation to Warden Troy Williamson on December 26, 2006. (Doc. 84, ¶ 144, Ex. 28; Doc. 91, ¶ 144.)

As the Warden of USP Lewisburg, Smith was bound by BOP policy, but it was not his responsibility to enact it. (Doc. 84, ¶ 145, Ex. 8; Doc. 91, ¶ 145.) Smith was responsible for the overall operation of USP Lewisburg. (Doc. 84, ¶ 146, Ex. 8; Doc. 91, ¶ 146.) He was not involved in the day to day operation of the SHU, specifically, in cell or cellmate assignments. (Doc. 84, ¶ 147, Ex. 8; Doc. 91, ¶ 147.) Smith testified if an inmate has a fight with a gang that is associated with New York, it is impossible to separate that inmate from everybody from New York just because he had a fight with somebody else from a gang associated with New York. (Doc. 84, ¶ 149, Ex. 29; Doc. 91, ¶ 149.) Smith further testified that he has seen "inmates from two separate gangs g[e]t into a fight and were back out on the compound after their disciplinary sanctions." (Doc. 84, ¶ 150, Ex. 29; Doc. 91, ¶ 150.)

In 2005, Edinger was a special investigative technician and gang specialist. Edinger testified that he has never been a SHU lieutenant. (Doc. 84, ¶¶ 151, 153 (,

Ex. 18; Doc. 91, ¶¶ 151, 153.) He disputes that he was responsible for placing Williams in the recreation cage on July 28, 2005. (Doc. 84, ¶ 152, Ex. 6.) He further testified that he had no involvement in cell assignments. (Doc. 84, ¶ 154, Ex. 18; Doc. 91, ¶ 154.) Although Edinger testified that he did not have any communications with Williams and that he was not aware that Williams was afraid of some D.C. gangs and New York gangs, Williams testified that he informed Edinger that he wanted to be housed in a different cell because of concerns for his safety and the possibility of being attacked by New York and D.C. gang members. (Doc. 84, ¶¶ 155-56, Ex. 18; Doc. 91, ¶¶ 155-56, Ex. 1.) Edinger also testified that "[c]ity, state doesn't really have anything to do with a person being in a gang." (Doc. 84, ¶ 157, Ex. 18; Doc. 91, ¶ 157.) He further testified that he would not "classify someone as being in a New York gang or a D.C. gang[,]" explaining "[t]hat's location, and that has nothing to do with gangs." (Doc. 84, ¶ 158, Ex. 18; Doc. 91, ¶ 158.) He explained that an inmate who has a fight with another inmate from D.C. is not a reason to separate that inmate from every inmate from D.C. (Doc. 84, ¶ 159, Ex. 18; Doc. 91, ¶ 159.) Additionally, Edinger explained that Bloods from all over the United States have been housed at USP Lewisburg and that USP Lewisburg houses New York Bloods, St. Louis Bloods, Texas Bloods, and California Bloods, and "[t]hey all run together . . . [s]o does the location of where they're from dictate anything, not really." (Doc. 84, ¶¶ 160-61, Ex. 18; Doc. 91, ¶¶ 160-61.) He also explained that D.C. Bloods do not fight New York Bloods. (Doc. 84, ¶ 162, Ex. 18; Doc. 91, ¶ 162.)

A review of the BOP's administrative remedy exhaustion records regarding

Williams reveals that he completed the administrative remedy process regarding the November 27, 2005 incident. (Doc. 84, ¶ 164, Ex. 30; Doc. 91, ¶ 164.) However, he did not attempt to file any requests for administrative remedies concerning either the July 18, 2005 incident or July 28, 2005 incident. (Doc. 84, ¶ 165, Ex. 30; Doc. 91, ¶ 165.) Williams conceded he did not complete a BP-8 for the July 18, 2005 incident. (Doc. 84, ¶ 166, Ex. 6; Doc. 91, ¶ 166.) Williams also conceded he did not complete a BP-8 for the July 28, 2005 incident, despite being advised to prepare a BP-8: "they were like, you know, write a BP-8 and stuff like that. I never wrote a BP-8." (Doc. 84, ¶ 167, Ex. 6; Doc. 91, ¶ 167.)

When Williams was asked who was involved in the conspiracy, he admitted "I'm not aware of that." (Doc. 84, ¶ 168, Ex. 6.) Williams further admitted that he did not write his complaint and he received assistance from other inmates. (Doc. 84, ¶ 169, Ex. 6; Doc. 91, ¶ 169.) He explained that someone else prepared his complaint: "that's something he probably put together." (Doc. 84, ¶ 170, Ex. 6; Doc. 91, ¶ 170.) He also testified that "there is no conspiracy claim . . . [t]hat I know of." (Doc. 84, ¶ 171, Ex. 6.)

With regard to Williams' due process claim, he could not testify as to why his due process rights were violated, stating "I don't know. I don't know." ((Doc. 84, ¶ 172, Ex. 6.)

Williams testified that his equal protection rights were violated because he "wasn't separated from other individuals from D.C. and New York . . . . I

wasn't housed by myself." (Doc. 84, ¶ 173, Ex. 6; Doc. 91, ¶ 173.) Williams claims

that he was treated differently than Fulton because Williams saw Fulton in "a

rec[reation] cage by hisself." (Doc. 84, ¶ 174, Ex. 6; Doc. 91, ¶ 174.)

## II.    Standard of Review

Through summary adjudication the court may dispose of those claims that do

not present a "genuine issue as to any material fact" and for which a jury trial

would be an empty and unnecessary formality. See FED. R. CIV. P. 56(c). The

burden of proof is upon the non-moving party to come forth with "affirmative

evidence, beyond the allegations of the pleadings," in support of its right to relief.

Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); Fed. R. Civ. P.

56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence

must be adequate, as a matter of law, to sustain a judgment in favor of the

non-moving party on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

587-89 (1986); see also FED. R. CIV. P. 56(c), (e). Only if this threshold is met may the

cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

## III.    Discussion

### A.    Administrative Remedies

The Prison Litigation Reform Act (PLRA) requires prisoners to present their

claims through an administrative grievance process before seeking redress in

federal court. The act specifically provides as follow:

19

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. §1997e(a). Prisoners must exhaust administrative remedies as to any claim that arises in the prison setting, regardless of any limitations on the kind of relief that may be gained through the grievance process. See Porter v. Nussle, 534 U.S. 516, 532 (2002); Booth v. Churner, 532 U.S. 731, 741 n. 6 (2001). "[I]t is beyond the power . . . of any . . . [court] to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis." Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) (quoting Beeson v. Fishkill Corr. Facility, 28 F. Supp. 2d 884, 894-95 (S.D.N.Y. 1998) (citing Weinberger v. Salfi, 422 U.S. 749, 766 (1975)). The PLRA "completely precludes a futility exception to its mandatory exhaustion requirement." Nyhuis, 204 F.3d at 71. The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court.[3] Woodford v. Ngo, 126 S.Ct. 2378, 2387 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Id. at 2386. Such requirements "eliminate unwarranted federal-court interference with the

---

[3]A prisoner does not have to allege in his complaint that he has exhausted administrative remedies. Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002). Failure to exhaust available administrative remedies is an affirmative defense that must be pleaded and proven by the defendants. Id.; see also Brown v. Croak, 312 F.3d 109, 111 (3d Cir. 2002).

administration of prisons, and thus seeks to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" Id. at 2387 (quoting Nussle, 534 U.S. at 525)).

Defendants contend that Williams failed to take any steps to complete the administrative remedy process with respect to either of the July 2005 incidents. In opposition, Williams states that "Defendants engaged in one continuous series of unlawful conduct that culminated when Williams was attacked by a cellmate on November 27, 2005. As conceded by Defendants, Williams has exhausted all available administrative remedies with respect to the November attack. Therefore, all of Williams' Bivens claims, which did not come to full fruition until the November attack, are properly before this Court." (Doc. 88, at p. 7.) It is undisputed that Williams exhausted his administrative remedies with respect to the claim that defendants failed to protect him from members of D.C. and New York gangs. Defendants motion will be denied in this respect.

B.     Statute of Limitations

The statute of limitations for a Bivens claim, as for claims arising under 42 U.S.C. § 1983, is borrowed from the forum state's personal injury statute.[4] Owens v. Okure, 488 U.S. 235, 250 (1989); Wilson v. Garcia, 471 U.S. 261, 276 (1985); see Kost

---

[4] The principles and analysis applicable to § 1983 actions are equally applicable to Bivens-type actions. See Schrob v. Catterson, 948 F.2d 1402, 1408 (3d Cir. 1991)(". . . courts have generally relied upon the principles developed in the case law applying to § 1983 to establish the outer perimeters of a Bivens claim against federal officials.")

v. Kozakiewicz, 1 F.3d 176, 190 (3d Cir. 1993). In Pennsylvania, the statute of limitations for personal injury actions is two years. 42 Pᴀ.C.S.A. § 5524. The statute of limitations "begins to run from the time when the plaintiff knows or has reason to know of the injury which is the basis of the Section 1983 action." Gentry v. Resolution Trust Corp., 937 F.2d 899, 919 (3d Cir. 1991) (citations omitted.)

Defendants argue that "Williams' constitutional claim of 'violent encounters' with members of D.C. and New York gangs prior to July 18, 2005 accrued prior to July 18, 2005 when such encounters occurred; thus, the limitations period expired sometime prior to July 18, 2007. Additionally, Williams' constitutional claim of a fight on July 18, 2005 accrued on the date of the fight, July 18, 2005; thus, the limitations period expired on July 18, 2007. This case began, at the earliest, upon the filing of the original complaint when Williams mailed it on July 26, 2007. (Ex. 1, Complaint (Doc. 1) at p. 15). Therefore, any claims of 'violent encounters' prior to July 18, 2005 or on July 18, 2005 are time-barred." (Doc. 13, at p. 14-15.) In opposition, Williams argues that "while . . . he had several violent encounters with members of the New York and D.C. gangs prior to July 18, 2005, the Defendants' conduct for which Williams complains did not occur until after Defendants knew that Williams should be separated from members of the New York and D.C. gangs for safety reasons; this did not occur until after Williams was attacked by Long, a D.C. gang member, on July 18, 2005. The first time Defendants knowingly placed Williams into a cell where his safety was at risk was on July 27, 2005. Therefore, because Williams makes no claim occurring prior to or on July 18,

2005, any statute of limitations argument related thereto is futile." (Doc. 88, at 9.) The court agrees. Defendants summary judgment argument with respect to the statute of limitations is without merit.

C.   Personal Involvement/ *Respondeat Superior*

Defendants argue that Smith is entitled to summary judgment based on his lack of personal involvement in conduct amounting to a constitutional violation. "A defendant in a civil rights action must have personal involvement in the alleged wrongs. . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207-08 (3d Cir. 1988); see also, Rizzo v. Goode, 423 U.S. 362 (1976); Atkinson v. Taylor, 316 F.3d 257 (3d Cir. 2003). Thus, individual liability can be imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged misconduct. Rode, *supra*. Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement. Rode, 845 F.2d at 1208.

Additionally, liability cannot be predicated solely on the operation of *respondeat superior*. Rizzo, 423 U.S. 362; Rode v. Dellarciprete, 845 F.2d at 1207. Therefore, to maintain a claim for supervisory liability, plaintiff "must show: 1) that the supervising official personally participated in the activity; 2) that the supervising official directed others to violate a person's rights; or 3) that the supervising official had knowledge of and acquiesced in a subordinate's violations."

<u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1293 (3d Cir. 1997); <u>Baker v. Monroe Twp.</u>, 50 F.3d 1186, 1190-91 (3d Cir. 1995).

It is undisputed that William's counsel forwarded to Smith a letter on August 16, 2005, notifying him of the July 27, 2005 assault, and requesting that the matter be investigated and that measures be taken for the safety and well being of Williams. (Doc. 84 ¶ 75, Ex. 17.) Defendants' motion for summary judgment on this ground will be denied.

      D.    <u>Eighth Amendment</u>

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. In the context of prisoner confinement, it is well-established that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994) (quoting <u>Helling v. McKinney</u>, 509 U.S. 25 (1993)). Not only must prison officials refrain from the use of excessive force against prisoners, <u>see</u> <u>Hudson v. McMillan</u>, 503 U.S. 1, 6-7 (1992), and ensure that prisoners receive adequate food, clothing, and medical care, <u>Farmer</u>, 511 U.S. at 832-33, but they must also "take reasonable measures to guarantee the safety of the inmates" vis-a-vis other inmates, <u>Hudson v. Palmer</u>, 468 U.S. 517, 526-27 (1984); <u>see also</u> <u>Hamilton v. Leavy</u>, 117 F.3d 742, 746 (3d Cir. 1997). As the Supreme Court has stated, "Being violently assaulted in prison is simply 'not part of the penalty that criminal offenders pay for their offenses against society.' " <u>Farmer</u>, 511 U.S. at 834 (quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981)).

24

Thus, the Eighth Amendment places upon prison officials a duty to "take reasonable measures to protect prisoners from violence at the hands of other prisoners." Hamilton, 117 F.3d at 746 (quoting Farmer, 511 U.S. at 833). In order for a plaintiff to prove a constitutional violation in a failure-to-protect case, a claimant must demonstrate that: (1) he is "incarcerated under conditions posing a substantial risk of serious harm;" and (2) the prison officials acted with "deliberate indifference to his health and safety." Farmer, 511 U.S. at 834; see also Beers-Capital v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001); Hamilton, 117 F.3d at 746.

The court must conduct an objective analysis under the substantial risk prong of the inquiry, see Farmer, 511 U.S. at 834; Hamilton, 117 F.3d at 746, and as such, the inquiry ordinarily will not be satisfied by evidence of a single incident or isolated incidents, see Riley v. Jeffes, 777 F.2d 143, 147 (3d Cir. 1985). An objectively substantial risk of harm, however, may be "established by much less than proof of a reign of violence and terror." Id. (quoting Shrader v. White, 761 F.2d 975, 978 (4th Cir. 1985)).

In cases of prisoner incarceration, Eighth Amendment liability attaches only to the "unnecessary and wanton infliction of pain." Wilson v. Seiter, 501 U.S. 294, 298 (1991) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). Thus, not only must a prisoner's conditions of incarceration be sufficiently serious, but prison officials must possess a "sufficiently culpable state of mind" in allowing such a condition to persist. Beers-Capital, 256 F.3d at 125. This second prong of the Eighth Amendment inquiry requires the court to analyze whether prison officials were,

from a subjective standpoint, deliberately indifferent to an inmate's health or safety. Farmer, 511 U.S. at 834. Specifically, the question is whether an official consciously knew of and disregarded an excessive risk to the prisoner's well being. See Farmer, 511 U.S. at 840-44; Hamilton, 117 F.3d at 747. It is not enough to show that the prison official was "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists." Farmer, 511 U.S. at 837. Rather, the prison official "must also draw the inference." Id. The official's actual knowledge may be proven by circumstantial evidence. Beers-Capital, 256 F.3d at 131.

The record demonstrates that there are issues of material fact with regard to the claim of whether defendants failed to protect Williams from members of D.C. gangs and N.Y. gangs which preclude the entry of summary judgment.[5] This claim will proceed to trial at the convenience of the court.

E.      Fourteenth Amendment Equal Protection

"The Equal Protection Clause commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" Vacco v. Quill, 521 U.S. 793, 799 (1997); U.S. Const. amend. XIV, § 1. This is not a command that all

---

[5]Defendants alternatively argued that they are entitled to qualified immunity. (Doc. 37, at 27.) This argument is rejected. Qualified immunity, as the Supreme Court has explained, is the principle that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A prisoner's Eighth Amendment right to be protected against violence at the hands of another inmate is well-established; defendants' argument that they acted properly is a defense on the merits, not a qualified immunity defense. See Beers-Capitol, 256 F.3d at 142 n. 15.

persons be treated alike, but, rather, a direction that all persons similarly situated be treated alike.  See City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985).  "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race," Whren v. United States, 517 U.S. 806, 813 (1996), or any other suspect classification.  See, e.g., Bakke v. California Bd. of Regents, 438 U.S. 265, 291 (1978) ("the guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color" and "racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination").

Williams testified that his equal protection rights were violated because he "wasn't separated from other individuals from D.C. and New York . . . .  I wasn't housed by myself."  (Doc. 84, ¶ 173, Ex. 6; Doc. 91, ¶ 173.)  Williams claims that he was treated differently than Fulton because Williams saw Fulton in "a rec[reation] cage by hisself."  (Doc. 84, ¶ 174, Ex. 6; Doc. 91, ¶ 174.)  Instantly, Williams comes forward with no evidence that he was treated any differently from those who were similarly situated to him.  The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Beyond his conclusory statements, Williams literally presents no evidence, documentary or otherwise, to support his

equal protection claim. Consequently, defendants are entitled to an entry of summary judgment on the equal protection claim.

F.    Conspiracy

In order to set forth a cognizable conspiracy claim, a plaintiff cannot rely on broad or conclusory allegations. D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1377 (3d Cir. 1992); Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989); Durre v. Dempsey, 869 F.2d 543, 545 (10th Cir. 1989). The Third Circuit has noted that a civil rights conspiracy claim is sufficiently alleged if the complaint details the following: (1) the conduct that violated the plaintiff's rights, (2) the time and the place of the conduct, and (3) the identity of the officials responsible for the conduct. Oatess v. Sobolevitch, 914 F.2d 428, 432 n.8 (3d Cir. 1990). See also, Colburn v. Upper Darby Twp., 838 F.2d 663 (3d Cir. 1988).

The essence of a conspiracy is an agreement or concerted action between individuals. See D.R. by L.R., 972 F.2d at 1377; Durre, 869 F.2d at 545. A plaintiff must therefore allege with particularity and present material facts which show that the purported conspirators reached some understanding or agreement or plotted, planned and conspired together to deprive plaintiff of a protected federal right. See id.; Rose, 871 F.2d at 366. Where a civil rights conspiracy is alleged, there must be specific facts in the complaint which tend to show a meeting of the minds and some type of concerted activity. Deck v. Leftridge, 771 F.2d 1168, 1170 (8th Cir. 1985). A plaintiff cannot rely on subjective suspicions and unsupported speculation. Young, 926 F.2d at 1405 n.16.

Defendants argue that Williams has done nothing more than present bare conclusory allegations of a conspiracy. The court agrees. Viewing the complaint in the light most favorable to Williams, he has failed to state a viable conspiracy claim against defendants. His allegations that defendants "did conspire to interfere with the civil, constitutional, and statutory rights of the plaintiff, through such overt and covert acts as herein above set forth to interfere and/or deprive the plaintiff of his Constitutional and Statutorily protected rights, equal privileges and immunities under the law," are conclusory, and do not meet the requirement that a civil rights conspiracy claim must contain specific facts that tend to show a meeting of the minds and concerted activity. (Doc. 1, at 11, ¶ VI.) As noted above, the party adverse to summary judgment cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. <u>Williams</u>, 891 F.2d at 460. Judgment will be entered in defendants' favor on the conspiracy claim will be granted.

G.    <u>Fifth Amendment Due Process</u>

The Fifth Amendment provides as follows:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. Const. amend. V.  Because the Fifth Amendment is not implicated by

Williams's complaint, defendants will be granted summary judgment on Williams's

due process claim.

**IV.**    **<u>Conclusion</u>**

Based on the foregoing, defendants' motion for summary judgment (Doc. 79)

will be will be granted in part and denied in part.

An appropriate order will issue.



   <u>S/ Christopher C. Conner</u>
CHRISTOPHER C. CONNER
United States District Judge



Dated:        September 30, 2010

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEITH A. WILLIAMS,** | : | **CIVIL ACTION NO. 1:07-CV-1382** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH SMITH, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 30th day of September, 2010, upon consideration of

defendants' motion for summary judgment (Doc. 79), and for the reasons set forth

in the accompanying memorandum, it is hereby ORDERED that:

1. Defendants' motion (Doc. 79) is GRANTED IN PART and DENIED IN PART.

2. The motion is GRANTED with respect to plaintiff's Fourteenth Amendment equal protection, Fifth Amendment due process, and civil conspiracy claims. Entry of Judgment is DEFERRED pending final disposition of the matter.

3. The motion is DENIED with respect to plaintiff's Eighth Amendment failure to protect claim.

4. The matter will proceed to trial at the convenience of the court.


    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge